SAMUEL CABOT & others, Executors, *vs.* THOMAS C. AMORY, Executor, & others.

Merchandise was shipped under an agreement between the shippers and the shipowner that it should be carried around Cape Horn or elsewhere for a market, and the net proceeds, deducting charges and master's commission on sales, invested in specie or bullion and shipped to the United States or Canton; if to Canton, to be invested in such goods as the shippers might direct, to be shipped to Boston, subject to a deduction of the usual charges, and on their arrival in Boston to be sold by auction, and, after deducting from the net proceeds the original cost and all charges except premiums of insurance and interest on the money, "the residue or profits to be equally divided between the shipper and shipowner." The ship went around Cape Horn, and the master sold the cargo in Chili and Peru for specie, part of which was forcibly taken from him by the government of Chili, then at war with Spain; and, being unable for want of funds to proceed to China at once, traded along the coast, and afterwards went to Canton, invested the remaining proceeds of the outward cargo and other funds in a cargo for Peru, and there sold it for specie, part of which he remitted to Boston, where it was distributed among the shippers, and the residue with the brig were seized and appropriated by the Chilian government, who many years afterwards, under treaty with the United States, paid about two thirds of the cost of the original cargo, with interest from the time of seizure. *Held,* that the owner of the ship was not entitled to any portion of the money paid by Chili, although, including the interest, it exceeded the original cost of the goods; nor of the money sent home by the captain from Peru, without proof of the terms upon which the goods were shipped from Canton to Peru.

BILL IN EQUITY, in the nature of a bill of interpleader, filed by the executors of the will of Thomas H. Perkins, for directions as to the distribution of a sum of money in their hands. The parties agreed upon the following facts:

In 1818 several merchants of Boston shipped separate invoices of merchandise on board the Brig Macedonian, then lying at Boston, and owned by John S. Ellery, under written contracts, annexed to the bill of lading, in these words:

" It is agreed between         , shipper, and John S. Ellery, owner of the Brig Macedonian, that the merchandise, specified in the annexed bill of lading, amounting as per invoice to         shall be carried in said vessel to one or more ports and places, round Cape Horn, or elsewhere for a market; and the net proceeds, after deducting all charges arising on said goods, and two and a half per cent., the captain's commission on the net sales, shall be invested in specie or bullion, and be shipped in said brig (or in case this vessel should be sold, in

some other American vessel) to the United States or Canton; if to the latter place, it shall be invested in silks or nankins, of such description as the shipper may direct, and to be shipped to Boston, subject to a deduction of the usual charges in Canton, and two and a half per cent. commission to the master for investing the money, or to a deduction of one per cent. in case it is not invested and comes in specie or bullion to the United States direct. It is understood that if the proceeds should be shipped in any other vessel than the Macedonian, the freight is to be paid by the owner of said brig.

" On the arrival of the said goods in Boston, they are to be sold at auction, and the net proceeds, after deducting the duties and all other charges arising on said goods, excepting premium of insurance and interest of the money, are to be divided as follows : the original cost of the goods to be deducted from the net proceeds, and the residue, or profits, to be equally divided between the shipper and shipowner, and in like manner if in specie and bullion, which is to be in full for the freight during the whole voyage.

" In case the vessel is sold, the captain will continue with the property until it is shipped for the United States ; and it is understood the owner is not liable for his conduct; and that the property is at the risk of the shipper, the voyage round. Dated at Boston, January 26th, 1818."

The brig sailed from Boston on the 5th of February 1818, and, after selling part of her cargo at Coquimbo and Valparaiso in Chili, went to Callao in Peru, and there sold and delivered the rest of the cargo in October 1818 to some Spanish merchants for the sum of $145,000 in specie, which was forcibly taken from the captain by the admiral of Chili, then at war with Spain. After this seizure, the captain, being prevented by want of funds from directly pursuing the contemplated voyage to China, employed the vessel in several coastwise voyages in South America; but afterwards proceeded to China, and, with the proceeds of the original outward cargo, and other funds, purchased Chinese merchandise, which was shipped in a single invoice in the name of " John S. Ellery and others;" and with

this, and other merchandise shipped by other merchants at Canton on their own account, returned to Peru, and there sold the greater part of the cargo, and remitted a portion of the proceeds arising from the sale of this invoice of Ellery and others in specie to Boston, where it was distributed among the original shippers, according to the amount of their respective invoices; but the balance of the proceeds of the cargo there sold, amounting to $70,000, and the goods remaining unsold, were again seized, together with the brig, by the Chilian government, and converted to its use, and the brig never returned to the United States.

These seizures constituted just claims against the government of Chili, which, after many years of negotiation between it and the United States, were finally compromised by agreeing that Chili should pay for the first seizure of $145,000 the sum of $104,000, with interest at five per cent. per annum from the time of the seizure to the time of payment, in seven annual instalments.

Perkins, being personally interested in the matter as one of the shippers, was appointed by Ellery and the other shippers their common agent to prosecute the claim against Chili and receive and distribute the proceeds, and by his verbal agreement with Ellery was to receive a commission in compensation for his services. He received in 1843–1845 from the Chilian government the first three instalments, and, after deducting all charges and expenses, and his own commission, and carrying to general account a certain sum to meet contingent expenses, accounted for and distributed the balance to and among the original shippers in proportion to their respective invoices. In 1846–1849 he received the remaining instalments from the Chilian government, which have never been distributed, but are now in the hands of the executors of his will, whose account shows a balance to be distributed of $134,378.19.

No freight, or other compensation in lieu thereof, has ever been paid to Ellery by any of the shippers; and his disbursements on account of the brig, from the time she left Boston until she was seized in Peru, amounted to over $70,000.

The executors of Ellery's will received a certain sum as an indemnity for the seizures made by Chili, and distributed the same among the original shippers, according to their respective original invoices, and these shippers have already received back the amounts of their original invoices.

By agreement of parties, this cause was "referred to Charles G. Loring, Esq., as auditor, to report the facts, with his decisions thereon," who made a report, to which the surviving executor of Ellery's will excepted, and so much of which as concerned his exceptions was as follows:

"The question whether Ellery is entitled to receive one half part of the surplus of the amounts that shall be adjudged payable to the shippers, above those at which their goods were invoiced, or any other compensation for the use of his vessel on either passage, presents great difficulties.

"In order to its intelligent discussion, it may be desirable to determine, in the first place, the relations of the parties under the contract contained in the bills of lading and the agreements thereto annexed. The undersigned is of opinion that by these the master was made the consignee or agent of the owners of the goods, so far as the safe custody and proper disposal of them, and the accounting for, and remittances or investment of the proceeds of them, were concerned; and the shipowner was thus exonerated from some of the liabilities under which he would have remained upon a mere bill of lading; but that the master continued the agent of the shipowner, for the due prosecution of the voyage described, insomuch, at least, that any voluntary departure from it was at his risk, at the least so far as his interest in the prosecution of it was involved; and so that any voluntary abandonment of it, or the inception of a new one, however consented to by the master as agent of the shippers, could give to him no rights of indemnity, or vest in him any other claims against them by reason of such abandonment.

"In the next place, it may be well, if possible, to define and determine the true meaning of the clause in which the compensation to the shipowner in lieu of freight was provided for, and what that compensation was to be.

" And first, it is manifest that none was to become due, or be the subject of any admeasurement, until after the arrival in Boston of the proceeds of the goods, whether in specie or in bullion, or invested in other merchandise. By the explicit terms and the nature of the contract the compensation was incapable of subdivision ; and was dependent upon the hazard of profit or loss upon the adventure throughout its whole accomplishment ; and was susceptible of no other adjustment than by the relation which the proceeds, thus returned to Boston, should bear to the cost of the goods at their place of departure. So that if the goods, or their proceeds, should have been lost at any point of the whole voyage, intermediate between that of its inception and that of its stipulated termination, even at the wharf in Boston before opportunity for unlading, no reward would have become due for the part performed. And no voluntary departure or abandonment, at any such intermediate point of its prosecution, could confer upon the shipowner any rights or claims to which he would have been entitled upon its accomplishment, whatever new ones might arise upon a variation of the enterprise, or upon entering on a new one ; for if the owner should be considered exempt from liability to the shippers for such departure or abandonment by the master, under the clause exempting him from liability for the master's conduct, (which is by no means clear, inasmuch as that clause may be construed as confined to an exemption from liability for the master's unfaithful custody or disposal only of the goods,) it is quite manifest that the master had no authority to bind them to any contract for another voyage, or to the fulfilment of the terms of the old one upon the substitution of another undertaking ; but that the relative rights and obligations of the parties would have to be determined according to the nature of the new enterprise, and upon proof of their subsequent ratification of it, there having been no precedent authority.

" It may be worth while also to observe that the compensation stipulated for in the agreement was one half of the surplus of 'the net proceeds,' which is described as 'the residue or profits,' in terms therefore excluding other sources of it, and to

be construed according to their ordinary acceptation in mercantile dealings.

" It becomes necessary then, under the guidance of these principles, to ascertain whether the funds in Perkins's hands, with interest computed as above prescribed, or any portion of them, are justly to be accounted profits upon the invoices of goods shipped at Boston, accruing on the voyage stipulated in the bills of lading and contracts annexed. It is obvious that the voyage itself was never performed. The one agreed upon was from Boston to South America, whence the proceeds were to be invested in specie and bullion, to be brought in the brig, or sent back, in the event of a sale of her, to Boston ; or to be sent to Canton for investment, and thence shipped to Boston, where they were to be sold, and the net proceeds, after deducting the invoice costs, were to constitute ' the profits ' to be divided between the owner and the shippers.

" But this enterprise was broken up and frustrated, at the port of outward destination, by the forcible seizure of nearly the whole proceeds of the sales of the goods invoiced, by the Chilian government; so that such proceeds could neither be sent to Boston or Canton, nor invested there and returned to Boston, pursuant to the contract ; and so that any possibility of ascertaining any profits, by the only test and mode of determination prescribed by it, was utterly defeated. And the vessel, after prosecuting several intermediate voyages occupying the best part of a year, for the sole account and benefit of her owner. proceeded to Canton with another cargo, including a portion only of the proceeds of these sales, and which upon this statement must have been a small one only ; and under relations to other shippers, and with an intended termination of the voyage in Peru, which render it impossible to consider it any continuation of that originally undertaken. Inasmuch therefore as the voyage, the performance of which was to be precedent to the existence of the profits stipulated for, and the only test, or mode of ascertaining any, became impracticable, it seems to follow that no. such profits can be considered as having accrued, constituting or represented by any portion of the funds in the hands of Per-

kins; they being derived solely and exclusively from the indemnity paid by the Chilian government from the seizure and confiscation of a part of the proceeds of the sales of the outward cargo.

" It was argued however that, although the particular voyage was not completed, nevertheless this portion of it to South America was performed; and the parties, having accepted the proceeds of the sales made in South America, as paid over by the Chilian government, have so far ratified and confirmed the proceedings of the master, or consented to the abandonment of the voyage, and so have become liable *ex æquo et bono* to compensate the owner, *pro rata itineris*, for such part performance of the contract.

" It seems to the undersigned however, that so far as any claim for a *pro rata* compensation may be supposed to rest upon an implied abandonment of the voyage, or consent to such abandonment on the part of the shippers, it would be enough to say, that it could not be considered as one made by the shippers, any more than by the owner; the master being in that respect, if an authorized agent of the shippers, at least equally one of the owners; and a mutual abandonment could give neither any rights under the contract. But it seems impossible to consider these proceedings in any such light. There was no voluntary abandonment on either side, but a forcible disruption of their contract; nor was there any acceptance by the shippers of the proceeds of their goods as in part fulfilment or furtherance or continuation of the voyage. For if the moneys received from the Chilian government could by any stretch of reasoning or imagination be considered as the proceeds of the cargo, they were never received there as such, for the purposes of the original enterprise; and the payment of them from twenty nine to thirty five years afterwards, as an indemnity for a confessedly criminal violence committed upon neutral property, can hardly be accounted as delivery over of the proceeds in kind, or by way of substitution. Besides, they never were received by the master there, but were paid here under treaty with our government; and the principal sum paid fell far short of the actual amount

seized, and of the invoice cost of the goods.   Nor can this be considered a case where, although the contract was not entirely fulfilled, an equitable claim arose from a benefit derived from a partial performance; for, although the goods appear on this statement to have been sold and delivered there at a profit upon the investment, yet the proceeds were seized and became totally lost; so that no benefit, but ruin, so far as that voyage was involved, was the immediate result of such part fulfilment of the contract.   Nor may it, as the undersigned thinks, be reasonably contended, that as a profit was made upon the sale of the outward cargo, and a partial indemnity has been awarded for the loss, justice requires an apportionment of the indemnity between all entitled to share in the profits and to reimbursement of the invoice value of the goods; for the only profits contemplated by the contract were those to be realized upon the termination of the voyage in Boston; and as those profits, if they can be so called in this discussion, became lost in Chili and never reached Boston, they cannot be esteemed as falling within the scope of the contract.

"But it is claimed, and has been argued with great ingenuity, that inasmuch as the total amount finally received from the Chilian government exceeds very considerably the invoice cost, and was paid in specie or bullion, the surplus over such cost is to be accounted profits, within the fair meaning of the contract, although the greater portion of it consists of interest paid from the time of the seizure; and that the gross amount paid is to be considered the proceeds of the goods, and as thus paid by instalments.

"If such amalgamation of principal and interest, under any circumstances, could be esteemed reasonable, the undersigned would still find insuperable difficulties in accounting the excess so received as profits of the voyage, within the contract under consideration.   The facts would still remain that the voyage was never completed, but forcibly broken up; and that therefore neither party could claim of the other as for its fulfilment; and that, whatever name might be given to the moneys thus paid and received, the shippers could not be considered as having

made any profits on the voyage, inasmuch as the total amount received would not be a reimbursement of the cost of the goods, allowing much less than legal rate of interest from the time of its termination by the seizure in Chili; so that they are greatly losers, although the whole amount paid at the expiration of thirty five years does exceed the original sums charged in the invoices, without interest thereupon. But the undersigned is entirely satisfied that, in deciding the question whether there were or were not any profits to be divided, it cannot be that the interest and principal are to be thus amalgamated, and so make the voyage to continue constructively for the space of thirty five years; which is essential to this hypothesis.

, " The voyage upon which the parties entered was finally and fatally terminated, so far as this portion of the adventure was concerned, at the time of the seizure of these proceeds; and they never were specifically restored, nor pretended to be. The rights of all the parties became at that moment fixed, *inter sese*, and as against the Chilian government, so far as the voyage agreed upon was concerned, its further prosecution having become impossible. Any indemnity, therefore, that became lawfully or equitably due from the seizors to any of the parties, became due to them then, and was to be accounted as payable then; and all compensation, subsequently becoming due for the neglect or omission or refusal of payment at that time, accrued to those entitled to such payment, as a mere indemnity for such neglect, omission or refusal. The interest was to be in no sense any part of the indemnity for the seizure, but only for the detention or omission to pay the money due for such seizure; and belonging to those only who had become entitled to it by reason of the seizure. If the one hundred and four thousand dollars had been paid forthwith, there could have been no pretence of any profits to be divided, for such indemnity would have fallen short of the cost in Boston; and it is impossible to consider the interest allowed for withholding the indemnity admitted to have been due then, as profits on such cost. Such an appropriation of the interest would be to aggravate the loss caused by the seizure, by depriving the shippers of a very large portion of the already insufficient indemnity allowed.

" Upon every view, therefore, which the undersigned has been enabled to take of this part of the case, he is of opinion and does therefore find and report that no portion of the funds received by Perkins, or now in the hands of the executors of his will, can be accounted profits, to be the subject of division between Ellery and the shippers.

" The remaining questions touching the amounts received and distributed by Ellery, being those paid by the Peruvian and Chilian governments on account of the seizure of the proceeds of a portion of the return cargo from Canton, and of such of the goods as were unsold, are attended with much greater difficulties, if not such as to render any satisfactory solution of them upon this evidence impossible, otherwise than by the application of the technical rules of law regulating the burden of proof. For the reasons above stated, and the fact that the voyage from Peru to Canton and back to Peru to terminate there was entirely inconsistent with that originally agreed upon, and that the terms upon which it was undertaken, as between the shipowner and the shippers, and between the shippers themselves, are entirely undisclosed, it must be considered an entirely new voyage, in which the master, without any authority, invested a portion of the funds belonging to the shippers of the original cargo in Boston ; though what portion, and how obtained, seems upon this evidence to be wholly unknown. We have no light therefore to guide us from the original contract. It is quite clear that this procedure on the part of the master, being wholly unauthorized, and not appearing to be dictated by any necessity, (there being no apparent difficulty in transmitting his funds saved from seizure in Peru to the owners in Boston,) and there being no warrant for investing them in further speculations between Canton and Peru, might have been repudiated by the shippers, who would thereby have become exonerated from any liability to the shipowner or the master, and entitled to claim of him full indemnity for all losses thus occasioned. And it might, under other circumstances, have become a question how far their receipt of the proceeds thus remitted and distributed would have been a ratification of his acts. But that

37 *

question, in the present aspect of the case, becomes immaterial, because, independently of other considerations, upon the only evidence before the auditor, there are no acts or relations known to which any such ratification, if existing, could attach. It is not known whether the shipments to Canton and back to Peru were on freight or half profits, under a charter, or under any stipulated arbitrary relations of value between the various interests involved in the voyage ; and therefore it is impossible to say what was thus ratified, if anything was. Nor is it known whether any, or if any, what indemnity was paid to Ellery for the seizure of his vessel, or the loss of freight, or of the profits of his voyage — all which were subjects of claim, and may have been, and, it may be supposed, were probably allowed with that for the loss of the goods.

" All that is known from this statement is that some funds belonging to these shippers were sent in this vessel to Canton and invested there, and, thus invested, were brought back to Peru ; and that a portion of the proceeds of the sales there was remitted to the executors of Ellery's will and distributed by them ; and that a portion of the proceeds of sales in Peru and the goods remaining unsold were also seized and confiscated ; and that indemnity to greater or less extent has been received by the executors of Ellery's will, and distributed among the shippers, in the ratio of their invoices, in instalments from 1843 to 1849.

" As the shippers have thus received the proceeds of the investments made by the master on their account in Canton, (although under circumstances that may well raise doubts whether such receipt could be accounted a ratification of his doings thus wholly unknown to them, or anything more than the plucking of so much salvage from the wreck ;) and as Ellery had thus performed a long voyage at necessarily great expense, there might seem to be some equitable claim on the part of his executors for freight or compensation to be paid by the shippers, if this were all that is or can be known ; though even then, as a legal question, the entire want of any evidence as to the nature of the voyage, whether upon a share of profits or otherwise,

and if upon profits, whether any were earned; or whether freight, if any was due, had not been deducted by the master in Canton, or on arrival at Peru; or whether the owner was not indemnified for the loss of his freight, or the emolument of his voyage consequent upon the confiscation of his vessel, (for which he was indemnified, in greater or less degree, as appears by the evidence,) as seems most probable, as such loss of freight or emolument constituted a claim equally meritorious with all others; would render it difficult, if not impossible, for any tribunal to render any satisfactory judgment in favor of such claim.

" Beside this, the executors, or those who transmitted or paid this money to them, must be presumed to have known or to have had means of knowing on what account it was paid, and what indemnity, if any, had been allowed of the nature above suggested; and it is not to be presumed that they would have paid over these sums to the shippers, if they were not satisfied that it belonged to them, or that their testator had any just claims to any part of it.

" It may be thought that the suggestion, that it is not known whether the master may not have deducted freight at Canton, or in Peru, is inconsistent with the last clause but one in the printed statement that ' no freight or other compensation in lieu thereof has ever been paid to Ellery by any of the shippers.' It is considered, however, that this clause must be interpreted as a mere statement that none had been paid by them personally, or by their knowledge; the confessedly total ignorance of all parties, upon all that took place abroad, would preclude the interpretation of an intended admission that none could have been, or that it was known that none had been so deducted or received. But if the clause were to be so construed, the other difficulties in the way of the legal adjudication of any specific amount as due would not be the less insuperable.

" In this state of the evidence, it is manifestly impracticable to determine the question concerning this claim for compensation satisfactorily, otherwise than by the application of the rules of law regulating the burden of proof. On that ground the

undersigned is constrained to find and to report that the claim is not sustained by the proof; but it is one which he thinks may reasonably be the subject of friendly compromise, if further satisfactory evidence be unattainable."

*W. Minot, Jr.*, for Ellery's executor. The contract annexed to the bills of lading was not for freight, but defined a commercial partnership adventure, enterprising and hazardous in its character, and uncertain in duration, between the shippers and shipowner. Each party contributed his capital; interest and freight were not to be charged, but were to be merged in the profits, or surplus; this surplus was to be equally divided, and each party shared in the risk of detention, or loss. The adventure was crippled, and finally prematurely terminated, by the default of neither party, but by a *vis major*, an illegal capture. If this misfortune is chargeable as any breach of the contract or cause of variation, the fault lies with the shippers, who failed to provide a cargo or funds for the continuation of the voyage. The cargo was seized, but the vessel did proceed on the voyage. The seizure by Chili of the $145,000 was after the adventure had so far advanced that the interest and property of the parties had become intermingled, and their rights to the proceeds had become joint and indissoluble. After the first seizure, the voyage was still carried out, by the common agent of the parties, according to his honest judgment, under the unforeseen contingency of the seizure; and the doings of the agent have been accepted and ratified by the shippers, by their acceptance of the proceeds of the Canton voyage, and they are now estopped to say that the voyage was broken up by the first seizure. It must be admitted that some freight was earned, for the outward cargo was safely delivered and the proceeds received, and so of a portion of the Canton cargo. The only just and reliable measure of that freight is the half profits; the measure stipulated by the parties, they expressly excluding time and interest. No freight or other compensation has been paid to Ellery, who has expended $70,000 in prosecuting the voyage; the shippers have received a large surplus, which has been earned through Ellery, and by the use of his property; they agreed to charge

no interest during the voyage, and divide the surplus; now they charge interest, refuse to divide the surplus, and propose to pay nothing for the carriage of their goods.

The $145,000 seized included profits which belonged to Ellery, and of which he had the right of possession. The indemnity, therefore, should be equitably apportioned to him, as one among the parties injured. It is a fund to be distributed equitably, according to the rights and interests of all the parties at the time of the seizure. *Appleton* v. *Crowninshield,* 8 Mass. 358. *Heard* v. *Bradford,* 4 Mass. 326. *The Friends,* Edw. Adm. 246. *Baillie* v. *Moudigliani,* Park on Ins. (7th ed.) 90.

The fact that the indemnity paid by Chili was in form of $104,000 and five per cent. interest, by way of compromise and to facilitate a settlement, cannot vary the rights of the claimants *inter se.* All that was received, to the extent of the $145,000, was the proceeds of the goods sold, and should be so treated. If this form of settlement excludes half profits, then the shippers charge interest, which, by the contract, they were not to do ; and they get, for their share, compensation for the detention of their capital, when it was agreed that none should be charged. Suppose the vessel and cargo had been illegally detained, on the homeward voyage, for ten years, the shippers could not have charged interest. How then can they appropriate interest paid for detention of cargo ? The whole indemnity was paid as damages. Ellery was damaged as much as the shippers. The seizure and detention crippled the voyage in which he was largely interested as shipowner, and kept the property from his business as well as from that of the shippers.

The interest paid by Chili was in fact profits earned by Ellery on the outward voyage ; the shippers' goods never could have been worth the $145,000, (their invoice in Boston being $105,000,) unless Ellery had transported them to Chili ; and he earned the difference between the invoice in Boston and the sale in Chili, one half of which, by the contract, was to be his ; so that the shippers' claim against Chili was in fact but for $125,000, and Ellery's claim was for the balance, $20,000.

If Ellery is not entitled to half profits, still he is entitled to

*pro rata* freight. The outward cargo was duly delivered and the proceeds received by the consignee of the shippers. This was an acceptance of the goods, and freight was therefore due.

The cargo only having been seized and confiscated, and the vessel not seized, but ready and able to perform her voyage, freight is due, on the principle that when capture attaches to the cargo, and not to the vessel, full freight is due. *The Racehorse,* 3 Rob. Adm. 101, & note. Abbott on Shipping, (7th ed.) 406, 471, & notes. 1 Kent Com. (6th ed.) 125. *The Société,* 9 Cranch, 209. *The Antonia Johanna,* 1 Wheat. 169. The shippers have also accepted the delivery of the outward cargo, by receiving a portion of the proceeds thereof, invested in the Canton voyage and cargo.

If the voyage was broken up by the first seizure, Ellery is entitled to freight to Callao, because the outward cargo was sold and delivered, and the price thereof received by the shippers through the Chilian government. If the voyage was continued, and the shippers elect so to consider it, then if half profits are not due, freight could be recovered in assumpsit; for the authority which continued the voyage was sufficient to imply an obligation to pay freight.

Freight is clearly due on the Canton cargo, or a part of it at least; for that was carried to its destination, sold, and the proceeds duly remitted to Boston, and divided among the owners of the cargo.

*F. C. Loring,* for the other defendants and the plaintiffs.

BY THE COURT. The reasons for the results reached by the auditor, to which exceptions are taken, are so fully and carefully stated in his report, that it is sufficient to refer to the report itself as a statement of the grounds and reasons upon which the exceptions are overruled. *Decree accordingly.*